Filed 9/15/25  P. v. Flores CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063330 |
| v. | (Super. Ct. No. 12NF1891) |
| CARMELO SANCHEZ FLORES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Scott A. Steiner, Judge. Affirmed as modified.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Carmelo Sanchez Flores appeals after a jury convicted him of three counts of committing a lewd act upon a child under 14 years of age. (Pen. Code, § 288, subd. (a).)[1] In a bifurcated proceeding, the trial court found Flores committed the lewd act offenses in counts 1 and 3 against more than one victim (§ 667.61, subds. (b) & (e)(4)) and the statute of limitations was tolled (§ 803, subd. (f)(l)) as to count 2. The court also found true a factor in aggravation (Cal. Rules of Court, rule 4.421(a)(11)) as to counts 1 and 3. The court sentenced Flores to an indeterminate term of 15 years to life on count 1, a consecutive indeterminate term of 15 years to life on count 3, and a consecutive determinate term of 6 years on count 2.

Flores contends the evidence is insufficient to support his conviction on count 3 and the abstract of judgment and sentencing minute order must be corrected. We direct the trial court to modify the abstract of judgment and sentencing minute order but otherwise affirm the judgment.

FACTS

I.

PROSECUTION EVIDENCE

*A. Count 1 Concerning K.C.*

K.C.'s father is related to Flores and was his business partner. Flores was very close with K.C.'s family; he frequently visited their house,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Flores was originally convicted of these crimes in 2013, and the judgment was affirmed on appeal in 2015. (*People v. Flores* (Nov. 25, 2015, G049760) [nonpub. opn.].) In October 2020, the United States District Court granted Flores's federal petition for writ of habeas corpus on the ground of ineffective assistance of counsel. The matter returned to the superior court for retrial.

attended the same parties as them, and went to some of K.C.'s school events.

During an event at a family member's home when K.C. was seven or eight years old, Flores entered the bathroom while K.C. was using it. Upon entering, Flores said, "Oh, sorry. Don't mind me. I'll just wait in the shower." Flores closed the bathroom door and got into the shower. K.C. finished what she was doing and went to wash her hands. Flores stood close behind her and placed his arms around her. He repeatedly asked if she wanted to show him her underwear. She did not recall exactly what she said to Flores in response. She felt "really frozen and stuck and . . . really small." When Flores walked out of the bathroom, K.C. followed behind him. K.C. went outside and sat down, confused about what had happened. She did not immediately tell her parents about the incident.

Within a year, there was a second incident in which Flores walked in on K.C. in the bathroom during a party at a family member's house. During this incident, he placed her hands on the toilet, had her bend over, and spread her legs. He put his hand inside her underwear, inserted his fingers in her vagina, and asked her if it felt good. She said, "No." After Flores washed his hands, he walked out of the bathroom, and K.C. followed. She felt "confused," "uncomfortable," and "gross." She did not tell her parents about the incident either.

In 2011, when she was around 14 years old, K.C. wrote in her personal journal about Flores. In one entry, K.C. wrote about the first bathroom incident: "'I was sitting on the toilet when I heard someone knocking. I said I was busy. Then the doorknob began to wiggle. I was confused. Did the person not hear me? I thought to myself. Then at that moment, he entered. Oh, I'm sorry, [K.C.], just continue what you're doing. . . . I'll just wait in the shower. I didn't know what to say. I finished

3

doing [my] business and got up to wash my hands. He helped me. As I turned toward the door, he trapped me from leaving. I was pinned' . . . . 'I was between him and the counter with both hands against the sink counter. It was very intimidating.'" In the entry, she also wrote: "'What color are your underwear? He whispered.' . . . [¶] . . . [¶] . . . 'I don't know, I answered. But I knew what color they were, pink with white princess crowns on them. Never again did I wear those underwear.'" She also drew a picture depicting the incident and wrote that she hated him.

Writing about the second bathroom incident with Flores, K.C. wrote: "'I am a statistic. I am not proud of it. I am a statistic of the girls that were sexually abused, molested before they reached age 10.'" In an entry addressed to Flores, she wrote: "'You took my innocence. Does that feel good? Let me tell you something, no. It did not feel good. It hurt. It hurt really bad. I remember wanting to cry. I was confused.'"

The police were contacted after K.C.'s mother found and read K.C.'s journals. K.C. first spoke to the police in 2012.

*B. Count 2 Concerning M.B.*

Around June 1993, M.B. attended the 14th birthday party of her friend L.S., who is related to Flores. Other friends and family members of L.S., including Flores, attended the party, which was held at L.S.'s residence at an apartment complex. M.B. was about 12 or 13 years old at the time and was introduced to Flores at the party.

As Flores and M.B. were walking around the apartment complex, Flores told M.B. she looked like another girlfriend of his and said he would come and take her away when she turned 18 years old. Flores remarked M.B. was half his age. At the carport behind the apartments, Flores kissed M.B.'s face, neck, and forcefully kissed her on the mouth. He touched her breasts,

put his hands down her pants, and inserted his finger in her vagina. The incident lasted several minutes and ended when someone walked up and told M.B. her mother was there to pick her up. M.B. realized her pants were unbuttoned. She buttoned her pants and left the party with her mother. She did not immediately tell her mother about it because she was afraid of Flores and embarrassed.

*C. Count 3 Concerning N.E.*

When she was seven or eight years old, N.E. lived at her grandparents' house with her parents, siblings, grandparents, and an uncle. N.E.'s mother is related to Flores. N.E. saw Flores at family parties infrequently.

On one occasion, when Flores visited the family at N.E.'s grandparents' house, N.E. and her younger brother took Flores downstairs to show him their dogs in the backyard. Kneeling down on one knee, Flores placed N.E., who was wearing a skort, on his lap and started caressing the outside of her thigh with "a stroking motion." As he was caressing her thigh, "little by little," he moved higher up her thigh, reaching her hip area. In doing so, he raised her skirt, but he did not put his hand under the shorts N.E. had on under her skirt. N.E. started feeling uncomfortable and stood up.

Later that night, Flores came into the bedroom where N.E. was sleeping and closed the door behind him. N.E. was in bed, under the covers, wearing a pair of yoga pants. The bedroom light was on. Flores sat down next to N.E. and started talking to her. He reached under the covers and started caressing her thigh, in a similar fashion as before, over her yoga pants. N.E. pushed Flores's hand away, but he reverted to caressing her thigh. N.E. said she was thirsty; she got up and left the room to get some water. She went to her parents' bedroom and asked her mother if she could sleep in their

5

bedroom, but N.E did not tell her mother about the incidents with Flores. After N.E.'s mother told N.E. she could not sleep in her parents' bedroom, N.E. returned to her bedroom but locked the door. Once she was back in bed, she heard the door jiggling a few times as if someone was trying to enter the room.

After these incidents, N.E. was scared of Flores when she saw him at family gatherings.

*D. Expert Testimony*

Dr. Jody Ward testified as an expert concerning child sexual abuse accommodation syndrome (CSAAS). She explained CSAAS is a pattern of behaviors exhibited by many children sexually abused by someone with whom they have an ongoing relationship. Ward discussed each of the five components of CSAAS: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed unconvincing disclosure, and (5) retraction and recantation. She was not familiar with the facts of the case and could not say whether abused occurred in this case.

II.

DEFENSE EVIDENCE

*A. Testimony of Friends and Family*

Several of Flores's friends and relatives testified in support of his defense that he is trustworthy. Female friends and relatives testified they are comfortable with Flores being around them and their daughters.

The defense also presented evidence concerning K.C.'s parents' efforts to talk to other people about Flores, find other victims, and get them to talk to the police.

6

*B. Expert Testimony*

Forensic psychologist Gangaw Zaw performed a psychosexual evaluation of Flores. She reviewed information about the case and conducted testing and a clinical interview with Flores. In her evaluation of Flores, she did not find any sexual deviancy or pedophilic disorders, including pedophilia. Flores displayed a normal adult male heterosexual arousal pattern.

Zaw also testified a person's memory can be partially true, partially inaccurate, and partially false.

DISCUSSION

I.

SUFFICIENCY OF THE EVIDENCE

Flores contends his conviction for committing a lewd act upon N.E. in count 3 must be reversed because there was insufficient evidence of sexual intent. We disagree.

*A. Governing Legal Principles*

"When a defendant challenges the sufficiency of the evidence, "'[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.] 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ""presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.""" (*People v. Clark* (2011) 52 Cal.4th 856, 942–943.)

7

Section 288, subdivision (a) prohibits "any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." "[A] lewd or lascivious act can occur through the victim's clothing and can involve 'any part' of the victim's body." (*People v. Martinez* (1995) 11 Cal.4th 434, 444.) "'[T]he purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done. . . . If [the] intent of the act, *although it may have the outward appearance of innocence*, is to arouse . . . the lust, the passion or the sexual desire of the perpetrator [or the child,] it stands condemned by the statute . . . .'" (*Ibid.*) But "the manner of touching is not irrelevant under this view. '[T]he trier of fact looks to all the circumstances, including the charged act, to determine whether it was performed with the required specific intent.'" (*Id.* at p. 445.) "Other relevant factors can include the defendant's extrajudicial statements," other acts of lewd conduct charged in the case, and the relationship between the defendant and the complaining witness. (*Ibid.*)

*B. Analysis*

Flores challenges only the sufficiency of the evidence of the intent element as to his section 288, subdivision (a) conviction in count 3. He contends his conviction should be reversed because there was not substantial evidence the touching of N.E.'s thigh was done for the purpose of sexual arousal. We conclude otherwise.

Substantial evidence supports the jury's finding Flores stroked N.E.'s thigh with the intent of arousing or gratifying his sexual desires. After placing N.E. on his lap, Flores caressed N.E.'s thigh in a stroking motion.

8

He moved his hand from her knee to her upper thigh, around her hip, and raised her skirt as he did so. In determining Flores's intent during this incident, the jury could also consider his actions later that night when he entered N.E.'s bedroom, placed his hand underneath her covers, again caressed her thigh, and persisted in doing so even after she pushed his hand away.

The jury was also instructed, consistent with CALCRIM 1191B, if it found the prosecution had proven the other charges beyond a reasonable doubt, it could "conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case." Thus, after finding Flores guilty of the other charged sex offenses, the jury could consider Flores's touching of K.C. and M.B. in determining Flores's intent when he caressed N.E.'s leg.

After reviewing the record, we conclude there is sufficient circumstantial evidence of Flores's sexual intent to support his section 288, subdivision (a) conviction in count 3.

II.

ABSTRACT OF JUDGMENT AND MINUTE ORDER

At sentencing, the court did not orally impose a court operations fee (§ 1465.8) or a criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)). However, the court's minutes of the sentencing hearing and the abstract of judgment for the indeterminate commitment indicate the court imposed a $40 court operations fee and a $30 criminal conviction assessment on each count.

Flores argues the abstract of judgment and sentencing minute order must be corrected to accurately reflect the trial court's oral

9

pronouncement of judgment by removing the court operations fees and criminal conviction assessments. The Attorney General agrees, as do we. "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls" (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385), and "this court has the inherent power to correct such clerical error on appeal" (*People v. Jones* (2012) 54 Cal.4th 1, 89). We direct the court to prepare and file an amended abstract of judgment for the indeterminate commitment and sentencing minute order omitting the court operations fee and criminal conviction assessment.

## DISPOSITION

The trial court is directed to prepare and file amended minutes of the November 15, 2023, sentencing hearing and an amended abstract of judgment for the indeterminate commitment that reflect no court operations fee (§ 1465.8) or criminal conviction assessment (Gov. Code, § 70373) were imposed. The trial court clerk is directed to forward a certified copy of these documents to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


MOTOIKE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


SCOTT, J.

10